# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-1548V

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * | | |
| ALISEN HUGHES, | * | |
| | * | Chief Special Master Corcoran |
| Petitioner, | * | |
| | * | |
| v. | * | Filed: November 7, 2023 |
| | * | |
| SECRETARY OF HEALTH AND | * | |
| HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * | | |

*Phyllis Widman*, Widman Law Firm, LLC, Northfield, NJ, for Petitioner.

*Sarah Rifkin*, U.S. Department of Justice, Washington, DC, for Respondent.

**ENTITLEMENT DECISION**[1]

On November 9, 2021, Alisen Hughes filed a petition seeking compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program").[2] Petitioner alleges that the measles-mumps-rubella ("MMR") vaccine she received on November 10, 2017, caused her to develop chronic arthritis and/or rheumatoid arthritis ("RA"), plus anxiety. Petition (ECF No. 1) at 1.

The matter is ready for resolution via ruling on the record—and to that end the parties have briefed their positions. Petitioner's Brief in Support, dated May 1, 2023 (ECF No. 47-1) ("Br.");

---

[1] Because this Decision contains a reasoned explanation for my actions in this case, it must be posted on the United States Court of Federal Claims website, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 (2012). As provided by 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) ("Vaccine Act" or "the Act"). Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

Respondent's Opposition, dated July 31, 2023 (ECF No. 51) ("Opp."); Petitioner's Reply, dated August 14, 2023 (ECF No. 52) ("Reply"). For the reasons set forth below, I find dismissal of the claim is warranted.

## I.   Factual Background

Petitioner's pre-vaccination medical history includes anxiety, depressed mood, chronic leg pain, bilateral leg swelling, and pain in the abdomen. Ex. 11 at 13–16; Ex. 3 at 252-56. She sought treatment in May 2016 for migraine headaches, leg muscle spasms and tenderness, and anxiety. Ex. 11 at 13–16, 20-23; Ex. 3 at 335–44. The records note that she had a "chronic" and "longstanding" history of such pain episodes. *Id*. at 337. Symptoms that treaters later proposed were anxiety-related led Petitioner to seek emergency care that fall. *Id.* at 308–14. And in 2017 Petitioner sought gastroenterologic treatment, and again complained that year of leg pain and swelling during her pregnancy. Ex. 9 at 18–20. Ex. 3 at 254–56.

*Vaccination and Subsequent Health Issues*

On November 8, 2017, Ms. Hughes gave birth through a natural and spontaneous delivery without complication. Ex. 5 at 2–11; Ex. 3 at 126–179. In the course of her hospitalization, she received an MMR booster vaccine on November 10, 2017. Ex. 3 at 179, 139; Ex. l. The record reveals no complaints of any immediate reaction or potentially-related symptoms. Over three weeks thereafter, on November 27, 2011, Petitioner went to an urgent care facility with complaints of congestion and a runny nose. Ex. 10 at 21–24. She was in no acute distress, and deemed to be likely suffering from an upper respiratory infection. *Id*. at 22.

In early January 2018 (now almost two months post-vaccination), Petitioner again sought urgent care—this time for a suspected urinary tract infection, although she did not report it be acute and did not complain of the kinds of symptoms (headaches, for example) the record reveals she had experienced pre-vaccination. Ex. 10 at 24–26. That same month, Petitioner visited the Hazlet Medical Center in Hazlet, NJ, with complaints of anxiety and a rash. Ex. 4 at 38, 98–100. But again, as the relevant record states, "[s]he report[ed] no muscle aches, no muscle weakness, no arthralgias/joint pain, no back pain, and no swelling in the extremities." *Id*. at 38.

Later that winter and into spring, Petitioner was treated several times for infectious-related illnesses. *See,* e.g., Ex. 3 at 79–84, 106–111. She also went to an emergency room in May 2018 complaining of rib pain associated with laying down on an uncomfortable surface. Ex. 7 at 60–65. That same month, she again experienced comparable rib pain, although this time she connected it with her own movement while holding her baby, and her pain was deemed mild overall. Ex. 3 at 61,63. The records indicate that she was in no apparent distress and her pain level was 2/10. *Id*.

There are numerous additional records from later in 2018 memorializing instances in which Petitioner sought medical care for a variety of conditions. *See,* e.g., Ex. 3 at 30–38 (May 30th ER visit for abdominal pain and nausea); Ex. 4 at 63–65 (June 4th visit to gastroenterologist for abdominal pain, diarrhea, and nausea that she suspected was caused by taking Zoloft); Ex. 7 at 6–11 (June 2018 ER visit for rib pain recurrence); Ex. 4 at 30–34, 91–94 (doctor's visit in mid-June for anxiety and recurrent chest pain); Ex. 3 at 8–11 (July ER Visit complaining of left-calf pain and tenderness); Ex. 4 at 22–26, 85–87 (July hospital visit for muscle aches, joint and upper back pain, and headaches).

Osteoarthritis or cervical radiculopathy were proposed as diagnostic explanations at this latter visit in July 2018—the first time in the records anything even remotely approaching the injury alleged in this case was suggested as explanatory. Ex. 4 at 26. And after this time for the rest of that year, although Petitioner continued to seek treatment for a wide array of concerns, her concurrent reports of joint/upper extremity pain was often characterized as cervical radiculopathy. *See,* e.g., Ex. 4 at 18–22, 82–84 (August 2018 treatment visit). She even underwent a CT scan of her cervical spine in October 2018 (in the course of getting treated for her gastrointestinal concerns), but it revealed no fracture, deformity, bony abnormality, or spinal stenosis. *Id.* at 13–19, 69–70.

*Treatment in 2019 and Beyond*

The overall tenor of the medical records filed for periods more than a year post-vaccination is comparable to what is discussed above—with Petitioner seeking medical care on a regular basis for a variety of unrelated concerns. *See,* e.g., Ex. 6 at 5–6 (April 2019 treatment for urinary incontinence and migraines); Ex. 10 at 38–40, 110–12 (complaints of difficulty breathing, tightness, and pain in her chest, neck, and back upon inhalation, with a treater impression of "chondrocostal junction syndrome"[3]); *Id.* at 116–17, 119–20, 122–23 (visits in the winter and early spring of 2020 for abdominal issues or URI-like symptoms). The record does reveal evidence of a wrist injury in January 2019, but specifically notes that this was an injury, with no mention of a chronic condition. *Id.* at 34. Only in April 2020 (two and one-half years post-vaccination) did Petitioner obtain a rheumatologic assessment—from her expert, Dr. Brawer—and that is discussed below. No other documents for the period thereafter bear on the claim or assist Petitioner's argument, and are therefore not discussed.

---

[3] Chondrocostal junction syndrome is also known as "Tietze Syndrome," and defined as "idiopathic painful nonsuppurative swellings of one or more costal cartilages, especially of the second rib; the anterior chest pain may mimic that of coronary artery disease." *Tietze Syndrome*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=111518 (last visited November 2, 2023)

## II. Expert Reports

### A.    Petitioner's Expert – Dr. Arthur Brawer

Dr. Brawer, a rheumatologist, prepared three written reports in this matter. *See* Report, dated April 28, 2020, filed as Ex. 8 (ECF No. 9-2) ("First Brawer Rep."); Report, dated February 28, 2022, filed as Ex. 12 (ECF No. 31-1) ("Second Brawer Rep."); Report, dated October 19, 2022, filed as Ex. 14 (ECF No. 38-1) ("Third Brawer Rep."). Dr. Brawer directly examined Ms. Hughes, and he opines that she experienced RA and/or chronic arthritis due to her receipt of the MMR vaccine.

Dr. Brawer did not include a CV with any of his reports, but his credentials have been established in other cases (including decisions I have issued). *See,* e.g., *McDonald v. Sec'y of Health & Hum. Servs.*, No. 15-612V, 2023 WL 2387844 (Fed. Cl. Spec. Mstr. Mar. 7, 2023); *Clark v. Sec'y of Health & Hum. Servs.*, No. 17-1553V, 2023 WL 4897284 (Fed. Cl. Spec. Mstr. June 16, 2023). Dr. Brawer is a rheumatologist in private practice. He received his M.D. from Boston University, then completed a residency in internal medicine and a fellowship in arthritis. *McDonald,* 2023 WL 2387844 at *4. He has held board certifications in internal medicine and rheumatology (although it is not evident from his CV if they have been maintained over time). *Id.* He has also served as an associate clinical professor at Hahnemann/Drexel University School of Medicine in Philadelphia, as well as an assistant clinical professor of medicine at Robert Wood Johnson University School of Medicine in New Brunswick, New Jersey. *Id.* at 4. He also serves as a diplomate to both the American Board of Internal Medicine and the American Board of Rheumatology. *Id.* at 1, 4. He has also been director of rheumatology at Monmouth Medical Center. *Id.* at 1.

*First Report*

Dr. Brawer's first report was the product of his examination of the Petitioner in April 2020. *See generally* First Brawer Rep. He noted her history, and memorialized in his history section the contention that she "developed pain and stiffness and limited motion" in her left shoulder within a week of the November 2017 vaccination – despite a lack of record corroboration for that close-in-time onset. *Id.* at 1. He further reported that she had been experiencing comparable symptoms thereafter "on a daily basis," and that in the summer of 2018 she underwent lab testing for common RA biomarkers, but with consistent "normal or negative" results. *Id.* And then (relying further on the Petitioner' self-reporting), Petitioner began to develop "additive joint complaints" in the summer of 2019, although she saw significant improvement after being prescribed a steroidal medication that fall, but had more recently been experiencing hip pain, eye dryness, and some joint swelling along with morning stiffness and fatigue. *Id.* at 1–2.

4

Dr. Brawer's physical exam made numerous findings consistent with a normal presentation, but did observe several things more consistent with Petitioner's claim as well. For example, a test employed to measure tear production by the eye produced "markedly abnormal" results, and Petitioner's left shoulder movement resulted in pain at various degrees of rotation, as well as her left wrist. First Brawer Rep. at 2. Certain finger joints were "tender to palpitation" but displayed no swelling. *Id.* And Petitioner's left elbow displayed comparable tenderness. *Id.*

Based on the exam, Dr. Brawer deemed chronic arthritis "directly initiated by and related to the MMR vaccination" from 2017 to be a reasonable diagnostic explanation for Petitioner's condition. First Brawer Rep. at 2. For support, he noted that Petitioner's large and small joints were being impacted symmetrically, along with morning stiffness and fatigue. First Brawer Rep. at 3. He also maintained that chronic arthritis attributable to vaccination was "clinically indistinguishable" from RA—although in almost the same breath asserted that Petitioner did not suffer from idiopathic RA (seeming to place weight on the fact that he deemed Petitioner's symptoms to be a product of vaccination). *Id.* Significantly, however, Dr. Brawer gave no explanation for how vaccination was related to Petitioner's alleged RA/chronic arthritis (although he did propose another round of bloodwork to look for RA biomarkers). *Id.*

*Second Report*

The second report prepared by Dr. Brawer described subsequent examinations he performed on Petitioner in September 2020 and February 2022. He purports that since the time of his initial evaluation, Petitioner had "continued to manifest unremitting intractable pain, stiffness, swelling, limited motion, and pain on motion on a daily basis" in her joints. Second Brawer Rep. at 1. The report provides some specific observations to detail the nature of her condition. *Id.* In light of these subsequent exams, Dr. Brawer reiterated his prior conclusion that Petitioner was suffering from chronic arthritis attributable to the MMR vaccine. *Id.* at 2. But this report set forth no explanation for how the vaccine could be causal of Petitioner's purported injury.

*Third Report*

Dr. Brawer's final report was based on both another exam of Petitioner (from October 2022) as well as Respondent's expert report. Dr. Brawer began by denying he had opined that Petitioner was properly diagnosed with RA. Third Brawer Rep. at 1. He also maintained that he had accurately taken into account Petitioner's overall medical history (and a frequent lack of reference to any symptoms that could be deemed arthritic), noting (in one specific instance) that a record from January 2018 in fact did reference "foot pain" even though it also made no mention of joint pain. *Id.* He also repeated his contention that chronic arthritis was clinically indistinguishable from RA, reporting that it was supported by literature filed in the case (although

5

he provided no specific citation to the item in question). *Id.* at 1–2.[4] Dr. Brawer concluded that Petitioner's condition remained as he had observed in his prior reports. *Id.* at 1.

### B. Respondent's Expert – Dr. Mehrdad Matloubian

Dr. Matloubian, a rheumatologist, prepared a single written report for Respondent. Report, dated June 24, 2022, filed as Ex. A (ECF No. 36-1) ("Matloubian Rep."). He opined that Petitioner did not likely have RA or any other arthritic condition, and that the MMR vaccine had not otherwise caused her musculoskeletal symptoms.

Dr. Matloubian is a physician and Associate Professor of Medicine in the division of rheumatology at the University of California, San Francisco. CV, filed as Ex. B on June 29, 2022 (ECF No. 36-2)("Matloubian CV"), at 1. He has been on faculty at UCSF for approximately 20 years. Matloubian CV at 2. Dr. Matloubian is a board-certified and practicing rheumatologist, but also has a Ph.D. in virology/immunology and has been engaged in research in this area for more than twenty years. *Id.* at 8–14. His areas of expertise include T and B cell responses, especially to viruses as well as factors that regulate lymphocyte circulation and trafficking. *Id.* at 2–3; Matloubian Rep. at 1. Throughout most of his research career, he has focused on innate and adaptive immune responses, including those of T and B cells, to acute and chronic viral infections. *Id.* at 6–7. Dr. Matloubian has published many peer-reviewed articles in both areas. *Id.* at 8–11. Dr. Matloubian actively evaluates and treats patients with complex autoimmune diseases at a tertiary referral center and has a great interest in mechanisms of autoimmunity. Matloubian CV at 2. He is qualified to address both diagnostic and immunological issues regarding these diseases.

The first section of Dr. Matloubian's report is a summary of Petitioner's medical history as established by the filed records. Matloubian Rep. at 1–8. He highlighted therein the fact that for more than two years after the November 2017 vaccination, the record reveals no instances of any symptoms consistent with any kind of arthralgia or arthritis. *Id.* at 2–6. In fact, records from January 2018 (two months post-vaccination), July 2018, and October 2018 revealed no such complaints at all. *Id.* at 2–5. At most, rib and abdominal pain was reported and observed in May and June 2018, with some evidence of musculoskeletal complaints in July 2018. *Id.* at 3–4, 8. And even when arguably joint-related pain was reported, no swelling was observed. *Id.* at 5.

The first affirmative finding of chronic arthritis was thus not made until Dr. Brawer examined Petitioner in April 2020, long after vaccination. Matloubian Rep. at 6. And even in the context of these exams, certain critical indicia of arthritis, like joint swelling, were not observed. *Id.* at 7. In fact, blood testing ordered by Dr. Brawer did not reveal the presence of RA biomarkers, and other measures of ongoing inflammation were at most borderline elevated. *Id.*

---

[4] Harrison et al., *Patients Who Develop Inflammatory Polyarthritis (IP) After Immunization are Clinically Indistinguishable From Other Patients with IP*, 36 British Journal of Rheumatology 366, 369 (1997) filed as Ex. 16 (ECF No. 44-2).

Based on the foregoing review, Dr. Matloubian opined that Petitioner did not likely have RA "or any other inflammatory arthritis" that could explain her symptoms. Matloubian Rep. at 11. RA, he explained, is a common "systematic inflammatory disease" characterized by arthritis in the hands and fee joints, more often than not affecting women between the ages of 50 and 75, and having an insidious onset of pain, stiffness, and swelling over weeks to months. *Id.* at 8–9. To diagnose RA, first a treater must exclude a number of other rheumatic diseases (*e.g.,* lupus or reactive arthritis) or infectious diseases, and also must distinguish the possibility of osteoarthritis or fibromyalgia (which features joint pain without inflammation). *Id.*

RA has some common diagnostic criteria accepted in the field of rheumatology. Matloubian Rep. at 9. These include (a) demonstration of "involved joints with synovitis" (meaning joint tissue inflammation and swelling),[5] as opposed to pain alone, (b) proof of the existence of associated biomarkers as established by blood tests (RF or anti-CCP antibodies), (c) evidence of inflammatory biomarkers, and (d) symptoms lasting more than six weeks. *Id.* Dr. Matloubian stressed that the diagnosis is primarily clinical, and that the factor given the most weight is evidence of more than 10 small joints as being involved – although a threshold consideration is whether there is even *any* clinical evidence of swelling in a single joint. *Id.*

Here, Petitioner's presentation, based on her total post-vaccination course, was not in Dr. Matloubian's estimation consistent with RA. For example, Petitioner never even displayed any joint swelling until February 2022—*four years* after vaccination, and despite multiple intervening medical treatment events. Matloubian Rep. at 9. By contrast, she demonstrated no joint swelling at all at her first visit with Dr. Brawer in April 2020. *Id.* The idea that Petitioner might have only been experiencing chronic arthritis at this time, Dr. Matloubian maintained, was no explanation for the absence of this diagnostic factor, given that Dr. Brawer had maintained that chronic arthritis and RA were clinically indistinguishable. *Id.* The absence of swelling at this time, coupled with negative serologic findings, suggested to Dr. Matloubian that fibromyalgia or chronic pain syndrome better explained Petitioner's condition. *Id.*

The timing of onset of Petitioner's alleged arthritic condition was also inconsistent with vaccine causality (and in particular Dr. Brawer's contention of a one-week onset). Matloubian Rep. at 10. In fact, the medical record contained no colorable evidence supporting an RA diagnosis of any kind before January 2018—and that was limited to foot pain complaints that did not recur in later records, and could have been attributable to a "structural" issue like a bunion (especially since the record established the Petitioner had previously undergone bunion surgery). *Id.* The rib and chest/abdominal pain reported in the summer of 2018 was also not likely RA-related, Dr. Matloubian opined. *Id;* Christopher M. Wise, *Major Causes of Musculoskeletal Chest Pain in Adults*, UpToDate (2022) filed as Ex. A, Tab 3 (ECF. No. 54-3). And subsequent complaints of

---

[5] Synovitis is defined as "inflammation of a synovial membrane; it is usually painful, particularly on motion, and is characterized by a fluctuating swelling due to effusion within a synovial sac." *Synovitis*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=48576 (last accessed November 11, 2023)

7

cervical/neck issues could have been RA-related, but would commonly only manifest in "people with longstanding untreated RA," and in any event had not been deemed by the relevant treater to be more than cervical disc pain or radiculopathy. *Id.*

Dr. Matloubian concluded by addressing briefly whether the MMR vaccine (or any other vaccine for that matter) could be deemed associated with RA. He noted that Dr. Brawer's contention did not have identified medical or scientific foundation (and certainly had not been provided by Dr. Brawer in his reports). Matloubian Rep. at 11. To the extent the theory was that vaccinations could act like an infectious, inflammation-stimulating factor, the record showed that Petitioner had experienced numerous pre- and post-vaccination infections, with no evidence she had then developed chronic inflammatory arthritis. Thus, Dr. Brawer had provided nothing from an evidentiary standpoint to corroborate a putative association. *Id.* at 11–12.

### III.  Procedural History

The case was initiated in the fall of 2020, and (after its release from pre-assignment review in April 2021) originally assigned to a different special master. But the matter was reassigned to me after Respondent's Rule 4(c) Report. Export reports were thereafter filed through November 2022, and then I set a deadline for briefing of a ruling on the record determination. The parties completed briefing in August 2023.

### IV.  Parties' Arguments

#### A.  <u>Petitioner</u>

Although Petitioner's argument in her briefing follows the causation-in-fact analytical framework set by the Federal Circuit in *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1279 (Fed. Cir. 2005), she partially relies on a specific Table claim—chronic arthritis after receipt of the MMR vaccine. Br. at 1, 10. Only because she acknowledges she cannot likely meet the Table timeframe requirement (onset 7-42 days post-vaccination)[6] does she maintain a causation claim, arguing that the vaccine caused "chronic polyarthritis." *Id.* at 9.

First, Petitioner maintains she has preponderantly demonstrated the MMR vaccine can cause arthritis. Br. at 6–10. She maintains that medical science accepts a relationship between the rubella component of the MMR vaccine and "musculoskeletal complaints," and in particular with chronic arthritis and acute arthralgia. *Id.* at 7 Howson et al., *Chronic Arthritis After Rubella Vaccination,* 15 Clinical Infectious Diseases 307 (1992) filed as Ex. 18 (ECF No. 44-4). She references other articles suggesting vaccines can trigger chronic arthritis. Br. at 7-8; Harrison et al., *Patients Who Develop Inflammatory Polyarthritis (IP) After Immunization are Clinically Indistinguishable From Other Patients with IP*, 36 British Journal of Rheumatology 366, 369 (1997) filed as Ex. 16 (ECF No. 44-2); Robert E. Weibel and David E. Benor, *Chronic Arthopathy*

---

[6] 42 C.F.R. § 100.3(a)(IV)(A).

*and Musculoskeletal Symptoms Associated with Rubella Vaccines*, 39 American College of Rheumatology 1529 (1996) filed as Ex. 17 (ECF No. 44-3)**.** And she references the Table claim of chronic arthritis after the MMR vaccine. Br. at 8.

Second, Petitioner argues the "did cause" prong is also satisfied. Br. at 10. Petitioner was not only diagnosed with chronic arthritis by Dr. Brawer in April 2020, but in July 2018 (a contention that is questionable, since at most the term arthritis is referenced, but the diagnosis itself never embraced until Dr. Brawer's exam nearly two years later). *Id.* at 9; Ex. 4 at 85; Ex. 8 at 2–3. Otherwise, Petitioner was complaining of rib pain and arthralgias in that timeframe. Br. at 9. All of these symptoms post-dated vaccination, and are moreover consistent with the Table claim of MMR-chronic arthritis, and hence Petitioner need not demonstrate a "logical sequence of cause and effect" at all (an argument wholly at odds with her prior admission that the claim in this case is *styled* as causation-in-fact).

Finally, Petitioner asserts that the timeframe for onset of her chronic arthritis was medically acceptable. Br. at 11. Despite the fact that she did not seek immediate treatment, Petitioner has alleged she felt pain and fatigue in attempting to lift her infant—and this, coupled with Dr. Brawer's opinion and the evidence of foot pain in January 2018, was enough to establish a temporally-acceptable relationship with vaccination. *Id.* The fact that diagnosis came much later was irrelevant.

In Petitioner's reply to Respondent's brief, she gives more specific examples of complaints of muscle and joint pain given to treaters at various medical appointments in 2018. Reply Br. at 2–3. She also countered Respondent's arguments that she did not complain of arthritis-like issues during many other medical appointments in 2018, noting that these were ER visits limited to other specific issues. Id. at 3–4. Further, Petitioner argues that she did not seek treatment that would have confirmed a diagnosis of chronic arthritis prior to 2020 because she was busy caring for her baby. *Id.* at 5.

B.  Respondent

Respondent contends entitlement is not appropriate in this case. Opp. at 14. First, he disputes the propriety of *any* arthritis diagnosis—chronic or RA. *Id.* at 6–9. In so doing, Respondent references Dr. Matloubian's summary of the relevant diagnostic criteria, observing that the medical records from November 2017 to July 2018 reveal none of the factors needed for the diagnosis. *Id.* at 7–8. Although Dr. Brawer argued in response that he was not contending the Petitioner had RA, this was not reflected by Petitioner's pleadings – and was undercut as well by Dr. Brawer's opinion that RA and chronic arthritis are clinically congruent. *Id.* at 8–9. Dr. Matloubian's opinion was the product, moreover, of deep, demonstrated rheumatologic expertise. *Id.* at 9.

The three *Althen* prongs are also unmet, Respondent argues. Opp. at 9–13. The contention that the MMR vaccine "can cause" RA or chronic arthritis has not been substantiated with

sufficient independent proof or a persuasive theory from Dr. Brawer, who lacks expertise in immunology. *Id.* at 10. At most, Petitioner's corroborative support came in the form of stale literature, evidence derived from passive surveillance reporting data (which the Program recognizes to be weak proof of causation), or simply does not establish a cognizable association. *Id.* at 10–11.

The second *Althen* prong is unmet, since Petitioner mainly invokes the temporal association between vaccination and her purported onset. Opp. at 12. By contrast, ample record evidence establishes she had numerous treater visits prior to Dr. Brawer's exam, with no determination that she had any arthritic condition at all. *Id.* And the timeframe prong was unsatisfied as well. *Id.* at 12–13. Insufficient evidence has been offered by Dr. Brawer to explain how long scientifically/medically it would take for vaccine-triggered arthritis to manifest. *Id.* at 13. The record also did not corroborate Dr. Brawer's conclusion that onset occurred within a week of vaccination – with no arguably-arthritic complaints before July 2018. *Id.* at 12.

## V. Applicable Law

### A. *Standards for Vaccine Claims*

To receive compensation in the Vaccine Program, a petitioner must prove either: (1) that he suffered a "Table Injury"—i.e., an injury falling within the Vaccine Injury Table—corresponding to one of the vaccinations in question within a statutorily prescribed period of time or, in the alternative, (2) that his illnesses were actually caused by a vaccine (a "Non-Table Injury"). *See* Sections 13(a)(1)(A), 11(c)(1), and 14(a), as amended by 42 C.F.R. § 100.3; § 11(c)(1)(C)(ii)(I); *see also Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006).[7] In this case, Petitioner asserts a non-Table claim (but relies here and there on aspects of the MMR-chronic arthritis Table claim).

For both Table and Non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. Section 13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2; *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). In particular, a petitioner must demonstrate that the vaccine was "not

---

[7] Decisions of special masters (some of which I reference in this ruling) constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Hum. Servs.*, 40 Fed. Cl. 625, 630 (1998). By contrast, Federal Circuit rulings concerning legal issues are binding on special masters. *Guillory v. Sec'y of Health & Hum. Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd* 104 F. Appx. 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Hum. Servs.*, No. 13-159V, 2014 WL 504728, at *7 n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. Section 13(a)(1).

In attempting to establish entitlement to a Vaccine Program award of compensation for a Non-Table claim, a petitioner must satisfy all three of the elements established by the Federal Circuit in *Althen*, 418 F.3d at 1278: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury."

Each of the *Althen* prongs requires a different showing. Under *Althen* prong one, petitioners must provide a "reputable medical theory," demonstrating that the vaccine received *can cause* the type of injury alleged. *Pafford*, 451 F.3d at 1355–56 (citations omitted). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such a theory must only be "legally probable, not medically or scientifically certain." *Knudsen,* 35 F.3d at 549.

Petitioners may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1378–79 (Fed. Cir. 2009) (citing *Capizzano*, 440 F.3d at 1325–26). Special masters, despite their expertise, are not empowered by statute to conclusively resolve what are essentially thorny scientific and medical questions, and thus scientific evidence offered to establish *Althen* prong one is viewed "not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." *Id.* at 1380. Accordingly, special masters must take care not to increase the burden placed on petitioners in offering a scientific theory linking vaccine to injury. *Contreras*, 121 Fed. Cl. at 245.

In discussing the evidentiary standard applicable to the first *Althen* prong, the Federal Circuit has consistently rejected the contention that it can be satisfied merely by establishing the proposed causal theory's scientific or medical *plausibility*. *See Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019); *LaLonde v. Sec'y of Health & Hum. Servs.*, 746 F.3d 1334, 1339 (Fed. Cir. 2014) ("[h]owever, in the past we have made clear that simply identifying a 'plausible' theory of causation is insufficient for a petitioner to meet her burden of proof" (citing *Moberly*, 592 F.3d at 1322)); *see also Howard v. Sec'y of Health & Hum. Servs.*, 2023 WL 4117370, at *4 (Fed. Cl. May 18, 2023) ("[t]he standard has been preponderance for nearly four

11

decades"), *appeal docketed,* No. 23-1816 (Fed. Cir. Apr. 28, 2023). And petitioners always have the ultimate burden of establishing their *overall* Vaccine Act claim with preponderant evidence. *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1356 (Fed. Cir. 2013) (citations omitted); *Tarsell v. United States*, 133 Fed. Cl. 782, 793 (2017) (noting that *Moberly* "addresses the petitioner's overall burden of proving causation-in-fact under the Vaccine Act" by a preponderance standard).

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375–77; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). In establishing that a vaccine "did cause" injury, the opinions and views of the injured party's treating physicians are entitled to some weight. *Andreu*, 569 F.3d at 1367; *Capizzano*, 440 F.3d at 1326 ("medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'") (quoting *Althen*, 418 F.3d at 1280). Medical records are generally viewed as particularly trustworthy evidence, since they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Medical records and statements of a treating physician, however, do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. Section 13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 746 n.67 (2009) ("there is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted"). As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases. The views of treating physicians should be weighed against other, contrary evidence also present in the record—including conflicting opinions among such individuals. *Hibbard v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 742, 749 (2011) (not arbitrary or capricious for special master to weigh competing treating physicians' conclusions against each other), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012); *Veryzer v. Sec'y of Dept. of Health & Hum. Servs.*, No. 06-522V, 2011 WL 1935813, at *17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), *mot. for review denied,* 100 Fed. Cl. 344, 356 (2011), *aff'd without opinion*, 475 F. Appx. 765 (Fed. Cir. 2012).

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been equated to the phrase "medically-acceptable temporal relationship." *Id.* A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation." *de Bazan*

12

*v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must align with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id.* at 1352; *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 542 (2011), *recons. denied after remand*, 105 Fed. Cl. 353 (2012), *aff'd mem.*, 503 F. Appx. 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Hum. Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for review denied,* (Fed. Cl. Dec. 3, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

> B.   *Law Governing Analysis of Fact Evidence*

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. Section 11(c)(2). The special master is required to consider "all [] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." Section 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (determining that it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is evidenced by a rational determination).

As noted by the Federal Circuit, "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras*, 993 F.2d at 1528; *Doe/70 v. Sec'y of Health & Hum. Servs.*, 95 Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd*, *Rickett v. Sec'y of Health & Hum. Servs.*, 468 F. App'x 952 (Fed. Cir. 2011) (non-precedential opinion). A series of linked propositions explains why such records deserve some weight: (i) sick people visit medical professionals; (ii) sick people attempt to honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Hum. Servs.*, No. 11–685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras v. Sec'y of Health & Hum. Servs.*, 26 Cl. Ct. 537, 543 (1992), *aff'd*, 993 F.2d 1525 (Fed. Cir. 1993) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms").

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03–1585V, 2005 WL

6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are often found to be deserving of greater evidentiary weight than oral testimony—especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Hum. Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. denied*, *Murphy v. Sullivan*, 506 U.S. 974 (1992) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, the Federal Circuit has also noted that there is no formal "presumption" that records are accurate or superior on their face to other forms of evidence. *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). There are certainly situations in which compelling oral testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs.*, 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. *Andreu*, 569 F.3d at 1379; *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez*, 2013 WL 1880825, at *3 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203–04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination. *Burns*, 3 F.3d at 417.

C. *Analysis of Expert Testimony*

Establishing a sound and reliable medical theory often requires a petitioner to present expert testimony in support of his claim. *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1361 (Fed. Cir. 2000). Vaccine Program expert testimony is usually evaluated according to the factors for analyzing scientific reliability set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594–96 (1993). *See Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999)). "The *Daubert* factors for analyzing the reliability of testimony are: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community." *Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592–95).

The *Daubert* factors play a slightly different role in Vaccine Program cases than they do when applied in other federal judicial fora (such as the district courts). *Daubert* factors are usually employed by judges (in the performance of their evidentiary gatekeeper roles) to exclude evidence that is unreliable and/or could confuse a jury. In Vaccine Program cases, by contrast, these factors are used in the *weighing* of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Hum. Servs.*, 94 Fed. Cl. 53, 66–67 (2010) ("uniquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted"). The flexible use of the *Daubert* factors to evaluate the persuasiveness and reliability of expert testimony has routinely been upheld. *See e.g.*, *Snyder*, 88 Fed. Cl. at 742–45. In this matter (as in numerous other Vaccine Program cases), *Daubert* has not been employed at the threshold, to determine what evidence should be admitted, but instead to determine whether expert testimony offered is reliable and/or persuasive.

Respondent frequently offers one or more experts of his own in order to rebut a petitioner's case. Where both sides offer expert testimony, a special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe*, 219 F.3d at 1362). However, nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder*, 88 Fed. Cl. at 743 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see also Isaac v. Sec'y of Health & Hum. Servs.*, No. 08-601V, 2012 WL 3609993, at *17 (Fed. Cl. Spec. Mstr. July 30, 2012), *mot. for rev. denied*, 108 Fed. Cl. 743 (2013), *aff'd*, 540 F. Appx. 999 (Fed. Cir. 2013) (citing *Cedillo*, 617 F.3d at 1339). Weighing the relative persuasiveness of competing expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis to which special masters

must subject expert testimony in Vaccine Program cases. *Moberly*, 592 F.3d at 1325–26 ("[a]ssessments as to the reliability of expert testimony often turn on credibility determinations"); *see also Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("this court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act").

Expert opinions based on unsupported facts may be given relatively little weight. *See Dobrydnev v. Sec'y of Health & Hum. Servs.*, 556 F. Appx. 976, 992–93 (Fed. Cir. 2014) ("[a] doctor's conclusion is only as good as the facts upon which it is based") (citing *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("[w]hen an expert assumes facts that are not supported by a preponderance of the evidence, a finder of fact may properly reject the expert's opinion")). Expert opinions that fail to address or are at odds with contemporaneous medical records may therefore be less persuasive than those which correspond to such records. *See Gerami v. Sec'y of Health & Hum. Servs.*, No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. Oct. 11, 2013), *aff'd*, 127 Fed. Cl. 299 (2014).

### D.   *Consideration of Medical Literature*

Both parties filed numerous items of medical and scientific literature in this case, but not every filed item factors into the outcome of this Decision. While I have reviewed all the medical literature submitted in this case, I discuss only those articles that are most relevant to my determination and/or are central to Petitioner's case—just as I have not exhaustively discussed every individual medical record filed. *Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("[w]e generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.*, 527 F. Appx. 875, 884 (Fed. Cir. 2013) ("[f]inding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered").

### E.   *Standards for Ruling on the Record*

I am resolving Petitioner's claim on the filed record, in accordance with my own assessment of how best to decide the claim. The Vaccine Act and Rules not only contemplate but encourage special masters to decide petitions on the papers where (in the exercise of their discretion) they conclude that doing so will properly and fairly resolve the case. Section 12(d)(2)(D); Vaccine Rule 8(d). The decision to rule on the record in lieu of hearing has been affirmed on appeal. *Kreizenbeck v. Sec'y of Health & Hum. Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020); *see also Hooker v. Sec'y of Health & Hum. Servs.*, No. 02-472V, 2016 WL 3456435, at *21 n.19 (Fed. Cl. Spec. Mstr. May 19, 2016) (citing numerous cases where special masters decided case on the papers in lieu of hearing and that decision was upheld). I am simply not required to hold a hearing in every matter, no matter the preferences of the parties. *Hovey v. Sec'y of Health*

16

*& Hum. Servs.*, 38 Fed. Cl. 397, 402–03 (1997) (determining that special master acted within his discretion in denying evidentiary hearing); *Burns*, 3 F.3d at 417; *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 71500, at *2 (Fed. Cl. Spec. Mstr. Apr. 19, 1991).

## ANALYSIS

This matter warrants dismissal—and that determination does not require lengthy explanation. For it is easily ascertained, based on the record and filings, that none of the *Althen* prongs can be satisfied with sufficient proof for a finding in Petitioner's favor. There are simply too many issues with this claim.

The proper diagnosis is a primary deficiency. *Broekelschen,* 618 F.3d at 1349. Although (as Respondent accurately notes) Petitioner has previously *alleged* RA to be her injury (*see,* e.g., Amended Petition at 2), she now seems to prefer to characterize it as some kind of "chronic" arthritis. Yet she seems to concede she cannot meet the Table's onset requirement (Dr. Brawer's conclusory assertions to the contrary) – and indeed, applying the Table's "Qualification and Aids to Interpretation" definition of chronic arthritis, it is readily evident given the record facts that her clinical symptoms did not occur in that period of time, since there is no evidence of persistent swelling even within six months of vaccination. *See,* e.g., 42 C.F.R. § 100.3(c)(5) (defining chronic arthritis as "persistent joint swelling with at least two additional manifestations of warmth, tenderness, pain with movement, or limited range of motion"). At the same time, Dr. Brawer purports that, clinically speaking, chronic arthritis is equivalent to RA —but as Dr. Matloubian persuasively demonstrated, the diagnostic factors for RA are almost wholly unmet in this case. All that remains is the face of Dr. Brawer's diagnosis - but it was made too long after vaccination, and without a convincing overview of the record moreover, to be deemed facially credible.

In addition, even if the diagnosis was better substantiated by the record, the claim fails for its inability to establish the third *Althen* prong (and it is well understood in the Program that *all three prongs* must be satisfied for a favorable entitlement finding). Dr. Brawer has not established *what* timeframe would be medically acceptable for vaccine-caused arthritis. To the extent Petitioner would rely on the Table timeframe for chronic arthritis after the MMR vaccine (7 to 42 days), I cannot find on this record that Petitioner's arthritis likely *began* in that period—and certainly not before December 22, 2017 (42 days after the vaccination).

Symptoms that Petitioner points to as suggestive of the presence of some form of arthritis occurring in a "medically acceptable" timeframe (measured from the time of vaccination) cannot withstand close scrutiny. Petitioner's self-reported pain on lifting her child in November 2017 is too nonspecific in nature to be deemed evidence of any form of arthritis. Her January 2018 foot pain reports are not only isolated to that time (and hence not likely connected with her later-diagnosed arthritis) but occurred outside of that period. I also do not find Petitioner's rib pain was likely a harbinger of arthritis—and indeed there overall is insufficient evidence of *any* factors

identified by Dr. Matloubian in 2018 or 2019 (well before the later diagnosis, which I agree does not demarcate onset in this case). Thus, there is no reliable and persuasive proof of onset occurring in a medically-acceptable timeframe post-vaccination.

I have in this case opted to truncate my analysis, rather than painstakingly review each *Althen* prong in detail. This is permissible where it is fairly self-evident that a claim is not viable. Given the degree to which the Office of Special Masters is "overworked and understaffed," it is reasonable to at times apply a "non-traditional model" in resolving a case, rather than following the "traditional prong one, prong two, prong three *Althen* analysis." *Lozano v. Sec'y of Health & Hum. Servs.*, 143 Fed. Cl. 763, 769 (2019), *aff'd*, 958 F.3d 1363 (Fed. Cir. 2020). The alleged diagnosis has obvious deficiencies; the symptoms most consistent with any form of arthritis occurred far too long post-vaccination to implicate the vaccine; and expert support offered for the claim was notably thin.[8] Under such circumstances, special masters appropriately draw upon their experience-earned insight in grasping what cases do not merit large expenditures of otherwise-limited judicial resources.

## CONCLUSION

Petitioner has not preponderantly established her claim, and therefore she is not entitled to damages. In the absence of a timely-filed motion for review (see Appendix B to the Rules of the Court), the Clerk of Court shall enter judgment in accord with this Decision.[9]

**IT IS SO ORDERED.**

s/ Brian H. Corcoran
Brian H. Corcoran
Chief Special Master

---

[8] Petitioner's expert has no qualifications in immunology, and thus puts forth no actual theory as to how the vaccine causes chronic arthritis. The report he provided is more of a treater's report than the type of expert report typically presented in causation cases. Furthermore, the medical literature filed in support of Dr. Brawer's conclusion is largely outdated, and still does not present any theory of causation for how the MMR vaccine could cause a chronic form of arthritis that manifests months if not years post-vaccination.

[9] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing a joint notice renouncing their right to seek review.